OPINION OF THE COURT
Frank S. Rossetti, J.
An application by petitioner for appointment of a special guardian to transfer assets from an existing trust to a Medicaid pooled asset trust is denied, without prejudice to renewal on proper papers, in accordance with the following.[1]
Myra Altschuler, the alleged incapacitated person, is a 41-year-old unmarried woman who suffers from a mental health disorder (bipolar disorder with symptoms of psychosis). She presently resides in a State-operated community residence, having been hospitalized several times in the past few years because of said disorder. Her sister, Roberta Altschuler, is a 35-year-old unmarried woman who also suffers from developmental and mental health problems (mental retardation, autism, emotional disturbance and bipolar disorder). The latter presently lives in a group home run by the Young Adult Institute. Both receive Medicaid, and Myra also receives SSI.
On December 30, 1988, attorneys for Myra Altschuler set up a supplemental needs trust funded from her assets, which apparently consisted chiefly of her deceased mother’s house, in which Myra then lived.[2] The trust (hereinafter Income Trust) generally provides for the payment of income to the alleged incapacitated person and her sister, although there are provisions authorizing the invasion of principal with respect to housing for Myra.[3] Petitioner and two other cousins were named trustees of the Income Trust and, on December 27, 1993, they and Myra Altschuler signed an amendment to the trust which changed the residuary beneficiaries from three named charities to the United States or State and county governments for Medicaid reimbursement, to the extent of 50% of the trust assets remaining at the death of each of Myra Altschuler and Roberta Altschuler. The instant application is prompted by the *615 desire of all said trustees to no longer serve as such, and to provide for the long-term administration of the trust funds by transferring them to a charitable pooled asset trust (see, Social Services Law § 366 [2] [b] [2] [iii] [B]), to wit, the U.J.A. Federation Community Trust II (UJA Trust).
The Nassau County Department of Social Services (DSS) raises various objections to the requested transfer, but the underlying basis for its opposition is said transfer might defeat DSS’ right to reimbursement for Medica’d benefits provided. It first contends that if the existing Income Trust is a proper one, there is no need for a transfer. However, this contention is based on the assumption Medicaid would be paid out of any remainder and this in turn depends on the validity of the 1993 amendment. Since we find said amendment a nullity (see, at 618, infra), the Income Trust is at best an income-only trust and DSS apparently would have no right to reimbursement in light of the residuary beneficiaries thereof (cf., Social Services Law § 369 [2] [b] [i] [B]). Hence, not making the transfer would not necessarily have the consequences DSS believes and, more importantly, would seemingly not best serve the interests of the alleged incapacitated person (see, n 7, at 618, infra).
As to the UJA Trust, both DSS and the State point to the fact the New York State Department of Social Services has not approved this trust, but neither present any statutory or regulatory provision requiring such. Indeed, compliance with the applicable statutes is all that appears necessary and their other objections to the UJA Trust are seemingly based on a misreading of these statutes and related regulations, and the UJA Trust itself.
DSS indicates 18 NYCRR 360-4.5 (b) (5) (i) (a) requires that the State must be reimbursed from a trust remainder, but that provision applies to an individual trust established by a parent, grandparent, legal guardian or court (see, Social Services Law § 366 [2] [b] [2] [iii] [A]; 42 USC § 1396p [d] [4] [A]). It does not apply to pooled asset trusts and thus there is no inconsistency between that regulation and the one governing pooled trusts (see, 18 NYCRR 360-4.5 [b] [5] [i] [b]; Social Services Law § 366 [2] [b] [2] [iii] [B]; 42 USC § 1396p [d] [4] [C]).
The State contends petitioner’s proposal to have all Altschuler assets retained by the UJA Trust on the sisters’ deaths is "contrary to the clear intent of both the federal and State *616 statutory schemes.”[4] We find such hyperbole without merit. The provisions governing pooled trusts plainly state that "amounts remaining * * * which are not retained by the trust must be paid to the State up to the total value of all [Medicaid] paid on behalf of the individual.” (18 NYCRR 360-4.5 [b] [5] [i] [b] [emphasis added]; see, Social Services Law § 366 [2] [b] [2] [iii] [B]; 42 USC § 1396p [d] [4] [C] [iv].) This is in contradistinction to the noted individual trusts which contain no such proviso and whose governing provisions simply direct that "the State must receive all amounts remaining in the trust up to the total value of all [Medicaid] paid on behalf of the individual.” (18 NYCRR 360-4.5 [b] [5] [i] [a]; see, Social Services Law § 366 [2] [b] [2] [iii] [A]; 42 USC § 1396p [d] [4] [A].) While the general intent and effect of the 1993 Federal legislation establishing these trusts (i.e., Omnibus Budget Reconciliation Act of 1993)[5] may have been restrictive, these trusts were exceptions designed to benefit disabled persons. A third exception was an income trust and it also had the noted mandatory payment language of the individual trust (see, 42 USC § 1396p [d] [4] [B] [ii]). Thus we cannot deem the language for the pooled trust inadvertent or meaningless. Arguably, the language is clear enough to make resort to the rules of statutory construction unnecessary (see, McKinney’s Cons Laws of NY, Book 1, Statutes § 76), but such rules overwhelmingly support what we deem to be the plain meaning of the statute in any event (see, id., § 92 [b]; §§ 94, 98 [a]; §§ 114, 211, 213, 231, 232). A pooled trust is to be "for the benefit of disabled individuals” (18 NYCRR 360-4.5 [b] [5] [i] [b]; Social Services Law § 366 [2] [b] [2] [iii] [B]; see, 42 USC § 1396p [d] [4] [C] [iii]), and hence assets retained by such a trust would presumably be used for that purpose. Therefore, allowing said retention is consistent with the noted intent to provide exceptions for disabled persons. The UJA Trust provides that "the Trustees shall retain in the Trust such amounts remaining in the * * * Beneficiary’s account upon * * * death * * * as are specified in the Sponsor *617 Agreement, said amounts to be available solely for the benefit of other individuals who are disabled and which are not to be paid out as provided in subparagraph B.” (U.J.A. affidavit, exhibit A, § 7 [A].) Subparagraph B states "[t]he Sponsor Agreement may provide that up to fifty percent * * * of the amounts remaining in the * * * Beneficiary’s account upon * * * death * * * be paid over to such individuals as are named in * * * the Sponsor Agreement” and then specifies that "[a]ny sums to be paid to the State * * * as required by law shall be paid * * * before the Trustees shall make a distribution of the remainder * * * to such other individuals as provided in the Sponsor Agreement.” Therefore, while we ultimately find a transfer cannot be made on this application (see, at 618-619, infra), we do find the UJA Trust to comply with statutory requirements and hence a transfer to that trust could be proper, notwithstanding that such might defeat DSS’ would-be claim to reimbursement (see, at 615, supra).
DSS also cites 18 NYCRR 360-4.5 (b) (5) (ii) which provides that liens under Social Services Law § 104-b or § 369 must be satisfied before an individual or pooled trust will be deemed Medicaid exempt. However, not only has DSS failed to show any such lien, but, more importantly, this emergency regulation has been found unenforceable because inconsistent with clear legislative intent (see, Cricchio v Pennisi, 220 AD2d 100, 107, and cases cited therein).[6] Thus we find this would-be regulation no impediment to the requested transfer.
Unfortunately, the Income Trust from which the subject transfer would be made does provide an obstacle. By its terms, this trust is irrevocable and there are no provisions permitting revocation or amendment. Further, as noted, in its original, 1988 form, the Income Trust had three extant charitable residuary beneficiaries. As also observed, the 1993 would-be amendment was signed only by the settlor (i.e., the alleged incapacitated person) and the three trustees. Apparently the three residuary beneficiaries did not even know of the amendment, much less consent to it. Where there are no provisions for revocation or amendment, an irrevocable trust can only be amended pursuant to statute. (See, EPTL 7-1.9 [a]; Bogert, Trusts and Trustees § 992 [rev 2d ed]; cf., Werbelovsky v Manufacturers Trust Co., 12 AD2d 793.) The requisite written consents for amendment were not shown to have been obtained *618 and thus the 1993 amendment is a nullity. Hence the Income Trust must be construed according to its original terms.
As to the requested transfer, it is at least a de facto termination of the trust (see, e.g., 106 NY Jur 2d, Trusts, § 63) and the clear intent of petitioner is to revoke the Income Trust. Again, this must be done pursuant to statute (see, e.g., Matter of Warren v Cropsey, 29 AD2d 290, 296; cf., Werbelovsky v Manufacturers Trust Co., supra), and again the requisite consents from the residuary beneficiaries were not shown. No power was reserved in the Income Trust which would otherwise permit the total transfer of assets requested and hence statutory revocation is the only way the trust corpus can be taken out of this otherwise irrevocable trust. On the present record, such is not now possible. However, in view of the apparent benefits to the Altschuler sisters from having said remaining trust assets managed by a nonprofit organization which can provide management and other services on a long-term, lifetime basis,[7] the residuary beneficiaries may be willing to provide the necessary consents. Thus the denial here is without prejudice to renewal upon obtaining said written consents (see, EPTL 7-1.9 [a]).
An alternative recommended by Roberta Altschuler’s guardian ad litem is the appointment of successor trustees for the Income Trust.[8] We shall therefore keep this proceeding open for a renewed or new application, but only for two months. The court will defer its determination of the court evaluator’s fee, and any others, to August 30, 1996, or to a later date if further proceedings eventuate.[9]
Accordingly, it is ordered, that if no further application is made in this proceeding by August 30, 1996, the proceeding shall be dismissed and the court evaluator’s fee and any other *619 fee requested herein shall be determined, and it is further ordered, that the clerk of the guardianship part shall serve forthwith, by regular mail, a copy of this order upon the parties to this application.

. The court originally marked this application submitted on April 22, 1996, but the State was given permission to submit a response which was received on May 30, 1996 (see, at 614, infra). The matter was then marked finally submitted.

. The house has since been sold and the trust is now funded by liquid assets.

. Arguably, however, these provisions are subject to other, general provisions concerning government benefits.

. In the sponsor agreement for the UJA Trust, the option is given of having all or a specified percentage of the assets remaining on death retained in the Trust for the benefit of other disabled persons. Any percentage not so retained (limited to 50%) is to be distributed to named remainder persons, subject, however, to prior payment to the State in accord with the terms of the UJA Trust agreement. In petitioner’s sponsor agreement on behalf of Myra and Roberta Altschuler, it is specified that all remaining assets be retained in the Trust.

. Pub L 103-66 et seq.; 107 Stat 312 et seq.

. Cricchio (supra) dealt with an individual trust, but we find it equally applicable to the subject pooled trust, particularly since said emergency regulation covered both types of trusts (see, 18 NYCRR 360-4.5 [b] [5] [i], [ii]).

. The U.J.A. affidavit indicates that the UJA Trust provides lifetime personal advocacy for the disabled beneficiary through a U.J.A. Federation member agency, the Federation Employment & Guidance Service. This agency provides oversight and individual advice through quarterly visits, consultations on trust expenditures, Medicaid and SSI entitlement review and advice, and review of the beneficiary’s service/treatment plan.

. Said guardian also reported that Myra Altschuler was appointed a standby guardian for her sister in Surrogate’s Court in 1982. He recommends that a successor guardian be appointed there too. Such may be an appropriate use of trust income, but we make no determination in this regard at this time, except to note Roberta’s personal needs are apparently being adequately met in her current group home.

. Petitioner’s attorneys were also directed to submit affirmations of legal services (cf., at 614, supra), but did not do so.